IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 9:14-cr-00054 |
| vs. | ) | |
| | ) | **ORDER** |
| MARY MOONEY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on the parties' objections to the Presentence Report ("PSR") submitted on November 12, 2015, as revised in the addendum of March 28, 2016.

## I.  BACKGROUND

Defendant Mooney owned and operated an international adoption agency called International Adoption Guides, Inc. ("IAG"). Her codefendant James Harding operated a similar agency, World Partners Adoption ("WPA"). Both solicited prospective parents in the United States and placed children from overseas, including Ethiopia and Kazakhstan.

In order to place adoptees from Hague Convention countries, agencies must be accredited by the Council on Accreditation ("COA"), which screens international adoption agencies on behalf of the U.S. State Department. Harding unsuccessfully applied for COA accreditation for WPA, but Mooney was successful in getting IAG accredited. In 2008, Harding and Mooney arranged for Harding to take control of IAG. Mooney stayed on staff in order to maintain the COA accreditation that Harding had failed to acquire. Although she was no longer in control of IAG, Mooney falsely named

herself as its executive director and chief administrator in documents submitted to COA in 2010 and 2011.  IAG placed a number of children from Kazakhstan after 2008.  Kazakhstan is a party to the Hague Convention, therefore COA accreditation is required to facilitate adoptions from Kazakhstan.

On January 1, 2014, the government indicted Mooney, Harding and two others for conspiracy to defraud the United States in connection with a series of adoptions from Ethiopia beginning in 2006.  The indictment alleged in exchange for substantial fees that the defendants deceived clients and bribed or deceived government and regulatory officials in order to complete adoptions.  Ethiopia is not a party to the Hague convention.

On January 14, 2015, Mooney pled guilty to a one-count information alleging false and fraudulent statements to COA in the accreditation process, in violation of 42 USC § 14944.  In exchange for the plea, the government agreed to withdraw the pending indictment.

The Probation Officer prepared a Presentence Report on November 12, 2015.  Both parties submitted objections, which the probation officer addressed in an addendum prepared March 28, 2016.  The court convened a hearing into the objections on August 29, 2016.

## II.  ANALYSIS

### A.     Calculation of Loss under USSG § 2B1.1

The Probation Officer calculated Mooney's base offense level without an increase for pecuniary loss under USSG § 2B1.1(b).  The government objects, arguing that loss should include money paid to IAG by clients seeking adoptions from Kazakhstan after

2008, and also by clients who sought Ethiopian adoptions and relied on IAG's COA accreditation though it was not required for Ethiopian adoptions. The government further argues that loss should be calculated based on gross receipts, under USSG § 3B1.2 application note 3(F)(v), on the basis that Mooney falsely represented herself as a licensed professional.

The court finds that the Ethiopian adoptions are not relevant conduct to Mooney's offense of conviction, so receipts from Ethiopian adoptions should be excluded from loss calculations under § 2B1.1(b). The court further finds that application note 3(F)(v)(I) does not apply, because Hague accreditation is not a professional license within the meaning of the note, and because the accreditation was held by IAG as a separate corporate entity, and not by Mooney personally. However, the Kazakhstan adoptions after 2008 qualify as relevant conduct because they were part of the same course of conduct as the offense of conviction.

### 1. Relevant Conduct

In exchange for Mooney's plea, the government agreed to withdraw the indictment concerning the Ethiopian adoptions beginning in 2006; therefore Mooney is accountable for the Ethiopian adoptions only if they qualify as relevant conduct to her offense of conviction under USSG § 1B1.3. See U.S. v. Allmindinger, 706 F.3d 330, 341 (4th Cir. 2013).

The court calculates loss under USSG § 2B1.1(b) using the principles of relevant conduct. USSG § 1B1.3(a); U.S. v. Hayes, 322 F.3d 792 (4th Cir. 2003). Relevant conduct includes the offense of conviction, plus "all acts and omissions committed, aided,

3

abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for the offense, or in the course of attempting to avoid detection or responsibility for the offense." USSG § 1B1.3(b)(1)(A). Additionally, if the offenses are of a character that would require grouping under USSG § 3D1.2(d), relevant conduct includes acts described in (b)(1)(A) that were part of the same course of conduct or common scheme or plan as the course of conviction.

First, the court finds that none of the adoptions and resulting losses are relevant conduct under § 1B1.3(a)(1). Defendant Mooney's offense of conviction was making false statements on an accreditation application, in violation of 42 USC § 14944. The adoptions themselves were not committed during, in preparation for, or in the course of attempting to evade responsibility for those false statements.

Conduct that is excluded under § 1B1.3(a)(1) may still qualify under § 1B1.1(a)(2), if the offenses are groupable under § 3D1.2(d), and if they were part of the same course of conduct or common scheme or plan. Fraud offenses, generally, are groupable under § 3D1.2(d), and the court finds that the purported relevant conduct would be groupable.

### a.     Common Scheme or Plan

For offenses to be part of a common scheme or plan, they must be "substantially connected to each other by at least one common factor," such as common victims, accomplices, purpose, or similar modus operandi. Offenses that are not part of a common scheme or plan may still be part of the same course of conduct if they "are sufficiently

connected or related to each other as to warrant the conclusion that they are part of a single, episode, spree, or ongoing series of offenses." USSG § 1B1.3, cmt. n. 5(B).

The court finds that the adoptions are not connected to Mooney's false statements by any common factor sufficient to make them part of a common scheme or plan. While the post-2008 Kazakhstan adoptions were not part of a common scheme or plan, they qualify as relevant conduct because they were part of the same course of conduct as the offense of conviction.

### b.     Same Course of Conduct

In determining whether a series of events is part of the same course of conduct, the court should consider "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S. v. Pineda, 770 F.3d 313, 319 (4th Cir. 2014), citing U.S. v. Hodge, 354 F.3d 305, 313 (4th Cir. 2004). If one of these factors is absent, "a stronger presence of at least one of the other factors is required." Id.; USSG § 1B1.3, cmt. n. 5(B)(ii).

Mooney's offense of conviction made the Kazakhstan adoptions possible. The offense has a strong temporal connection since the accreditation was in effect during the entire course of Kazakhstan adoptions for which a COA accreditation was necessary. In Pineda, above, the court found that an uncharged drug transaction was part of the same course of conduct as the offense of conviction because, among other things, it directly led to the controlled purchases underlying the conviction. Pineda, 770 F.3d 319–20. Similarly, Mooney's false statements directly led to the post-2008 Kazakhstan adoptions; therefore they qualify as relevant conduct.

The government argues that Ethiopian adoptions where clients relied on IAG's Hague accreditation should count as relevant conduct under USSG 1B1.3(a)(1), though a COA accreditation was not required. The court finds that the Ethiopian adoptions, and any adoptions obtained prior to 2008, are not sufficiently connected to the offense of conviction to qualify as relevant conduct.

### B.     False Representation of Professional License

#### 1.     Application Note 3(F)(v)

The government argues that Mooney's base offense level should be increased by the total amount collected by IAG under application note 3(F)(v), which provides that:

> In a case involving a scheme in which (I) services were fraudently rendered to the victim by persons falsely posing as license professionals; (II) goods were falsely presented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or service.

USSG 1B1.1, cmt. n. 3(F)(v).

As an initial matter, subsections (II) and (III) by their own terms apply only to cases involving "goods" that are subject to governmental regulation. This case involves adoption services, not regulated goods, so the only subsection that could apply is (I).

The Sentencing Commission adopted application note 3(F)(v)(I) in 2001 to settle a circuit split over whether defendants who pose as licensed professionals may offset loss under § 2B1.1 by the value of "satisfactory" services rendered. USSG Amend. 617 (2001). The Commission explained its reasons for the amendment as follows:

> The definition of "loss" . . . provides special rules for certain schemes. One [new] rule includes in loss . . . the benefits received by victims of persons fraudulently providing professional services. <u>This rule reverses case law that has allowed crediting (or excluding from loss) in cases in which services were provided by persons posing as attorneys and medical personnel.</u>

66 F.R. 30512-01 (June 6, 2011) (Reasons for the Amendment).

Consistent with the Commission's explanation, courts have applied note 3(F)(v)(I) to defendants who posed as doctors or lawyers to accomplish their offenses. In the only Fourth Circuit opinion on point, the court affirmed the application of note 3(F)(v)(I) where the defendant posed as a physician providing government-regulated drug testing services. <u>U.S. v. Bennett</u>, 433 F. App'x. 395 (4th Cir. 2011). <u>Bennett</u> relied on the Eighth Circuit's opinion in <u>U.S. v. Kieffer</u>, 621 F.3d 825 (8th Cir. 2010), where the defendant fraudulently posed as a licensed attorney. <u>See also</u> <u>U.S. v. Hunter</u>, 618 F.3d 1062, 1065 (9th Cir. 2010) (defendant posed as a licensed nurse).

Note 3(F)(v)(I) has not been applied where a general operating license, such as a business license, was fraudulently obtained, or where the defendant would not have been required to hold a professional license. <u>See</u> <u>U.S. v. Allen</u>, 529 F.3d 390, 397 (7th Cir. 2008) (rule not applicable to defendant who posed as an expert biologist and "certified mold inspector" but was not required to hold a professional license).

Under this framework, note 3(F)(v)(I) would apply if the Hague convention accreditation was akin to a license to practice law or medicine. The court finds that the accreditation was not a professional license within the

7

meaning of the application note. In any event, the accreditation was not held by Mooney, but by IAG, a separate corporate entity.

### 2. COA Accreditation as a Professional License

Intercountry adoptions between Hague Convention signatories are governed by treaty. The U.S. State Department relies on the COA, a non-profit organization, to screen domestic private and public adoption agencies, confer accreditation, and monitor compliance on its behalf. See COUNCIL ON ACCREDITATION, http://coanet.org/home (last visited 10/24/2016, 11:41 am) (Council on Accreditation website).

COA imposes eleven criteria for private agencies to obtain accreditation. In particular, COA requires that a private organization "be incorporated or otherwise function as a distinct legal entity to be eligible." Eligibility Criteria - Private, Public, Canadian, Network, MFR, CYD, Hague, p. 3, COUNCIL ON ACCREDITATION, http://coanet.org/accreditation/private-organization-accreditation/#c1157 (select link to "Read COA's Eligibility Criteria for Private Organizations," located under heading for "Eligibility Criteria") (last visited 10/25/2016, 1:39 pm); see also 22 CFR § 96.12 (requiring accreditation for subject organizations).

The COA documents submitted by Mooney named IAG, a non-profit corporation, as the adoption service provider seeking accreditation. Mooney was listed as the executive director or CEO/agency head. Docket entries 142-11 (exh. 10-11); 152-2. This is consistent with COA's requirement that accredited

agencies function as independent, distinct legal entities.

Even if COA accreditation could be viewed as a "professional" license under application note 3(F)(v)(I), the license in this case was held by IAG, which was required to be a distinct legal entity from Mooney. Mooney fraudulently obtained accreditation for IAG, and the accreditation was based partly on her background and training, but she did not hold, and was not required to hold, COA accreditation herself.

Because Mooney did not falsely pose as a licensed professional, and because IAG did not otherwise offer government-regulated "goods," application note 3(F)(v)(I) does not apply.

### C. Number of victims

A fraud defendant's offense level may be increased based on the number of victims under USSG § 2B1.1(b)(2). The government argues that all clients involved in Kazakhstan adoptions and all clients who relied on IAG's accreditation in selecting the agency for Ethiopian adoptions should count as victims for this purpose. As discussed above, the court finds that only the post-2008 Kazakhstan adoptions are relevant conduct to the offense of conviction. The information charging the offense of conviction does not identify the number of victims. The government has submitted a spreadsheet, Gov. Exh. 1, which identifies 46 undated adoptions from Kazakhstan with corresponding payments. Those that took place after the fraudulent accreditation and transfer to Harding may count towards the number of victims; if they number more than 10, then the

2-point enhancement applies.

>    **D.     Committed from Outside of the United States**

The government argues that Mooney's base offense level should be increased under USSG 2B1.1(b)(10)(B), which adds two points if "a <u>substantial</u> part of the scheme was committed from outside the United States" (emphasis added). The court finds that although the offense had an international component, it was not substantially committed from another country. IAG was incorporated in South Carolina and based in the United States. Mooney's false statements, solicitations for business, and related financial transactions all occurred within the United States. The enhancement does not apply. See <u>U.S. v. Duperval</u>, 777 F.3d 1324, 1336 (11th Cir. 2015) (enhancement was proper where defendant lived and met with conspirators in Haiti, and worked at the Haitian business targeted by the conspiracy); <u>U.S. v. Ogunbanke</u>, 619 F. App'x. 586 (9th Cir. 2015) (enhancement applied where all alleged fraudulent credit card transactions were made overseas); <u>U.S. v. Escudero</u>, 628 F. App'x. 725, 726 (11th Cir. 2016) (enhancement applied where defendant obtained fraudulent credit cards in Mexico for use in the United States).

>    **E.     Use of a special skill**

The PSR added two points to Mooney's base offense level under USSG § 3B1.3, which applies if the defendant "used a special skill in a manner that significantly facilitated the commission or concealment of the offense." Mooney objects on the basis that her education and experience do not set her apart from

the general public.

A "special skill" is one that is "not possessed by members of the general public and usually requiring substantial education, training, or licensing." Examples include lawyers, doctors, accountants, chemists, and demolition experts. USSG § 3B1.3, cmt. n. 4. "While a special skill 'usually requir[es] substantial education, training, or licensing . . . substantial training is not a mandatory prerequisite to making a special skills adjustment." United States v. Gormley, 201 F.3d 290, 295–96 (4th Cir. 2000) (quoting U.S. v. Hummer, 916 F.2d 186, 191 (4th Cir. 1990), abrogated on other grounds by U.S. v. Hairston, 96 F.3d 102 (4th Cir. 1996)). The skill may also have been "obtained through the substantial equivalent of such training and must not be one that is possessed by members of the general public." Id. at 296 citing Hummer, 916 F.2d at 191.

The court finds that Mooney's education, training and experience in facilitating adoptions were special skills that are not held by the general public and that not only facilitated her offense, but made it possible. If her skills were possessed by members of the general public, then Harding would not have needed her to obtain COA accreditation. Harding was unable to obtain accreditation for his agency because he lacked Mooney's education and background. She used her special skills in this field, which she had acquired through a combination of her education, training, and experience, to commit her offense.

F.     **Defendant's Factual Objection**

Mooney objects to the PSR's characterization of the transfer of IAG's

11

control to James Harding as a sale.  The court finds that the record establishes, by a preponderance of the evidence, that Mooney agreed to relinquish executive control of IAG to James Harding in 2008, while remaining on staff in name only for the purpose of fraudulently maintaining COA accreditation, in exchange for $100,000.

### III.   CONCLUSION

For the reasons set forth above, the court finds that: (1) the post-2008 Kazakhstan adoptions qualify as relevant conduct and must be considered in calculating an increase for pecuniary loss under USSG § 2B1.1(b); (2) application note 3(F)(v)(I) does not apply to this case; (3) only the post-2008 Kazakhstan adoptions may be used to determine the number of victims; (4) no substantial component of the offense was committed outside of the United States; (5) Mooney used a special skill to significantly facilitate the offense; and (6) the PSR appropriately characterizes the transfer of IAG's control to Harding.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**November 7, 2016**
**Charleston, South Carolina**

12